```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
                   ATLANTA DIVISION
```

UNITED STATES OF AMERICA      :
                              :        CRIMINAL ACTION
     v.                       :
                              :        NO. 1:04-CR-232-BBM
JENNY NGUYEN, and             :
NHUNG NGUYEN                  :

RESPONSE TO DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL

     Come now the United States of America, by and through counsel,
David E. Nahmias, United States Attorney, and Jenny R. Turner,
Assistant United States Attorney, and file the following Response
to Defendants Jenny and Nhung Nguyen's (hereinafter the Defendants)
Joint Motion for Judgment of Acquittal pursuant to Rule 29(c) of
the Federal Rules of Criminal Procedure.

                I.  PROCEDURAL HISTORY

     On May 26, 2006, a jury found Nhung Nguyen (Nhung) and Jenny
Nguyen (Jenny) guilty of conspiring with one another, Hoang Nguyen
(Hoang), Terri Nguyen (Terri), and others to launder money in
violation of 18 U.S.C. § 1956(h).  The jury's verdict included
findings that the objects of the conspiracy were to engage in
financial transactions to conceal and disguise the nature, source,
location, ownership, and control of unlawfully derived funds in
violation of 18 U.S.C. § 1956(a)(1)(B)(i); to engage in financial
transactions in unlawfully derived funds to avoid a transaction
reporting requirement in violation of 18 U.S.C. §
1956(a)(1)(B)(ii); and to engage in monetary transactions in

unlawfully derived funds in amounts of more than $10,000.00 in violation of 18 U.S.C. § 1957.  The jury further found as to Nhung that an additional object of the conspiracy was to conduct financial transactions in unlawfully derived funds to promote drug dealing in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  On June 6, 2006, the Defendants timely filed their Motion for Judgment of Acquittal.  That Motion does not incorporate a request for a new trial.

<u>DISCUSSION</u>

The Defendants' Motion relies on Federal Rule of Criminal Procedure 29(c).  That rule allows the Court to set aside a jury's verdict and enter a judgment of acquittal even after the jury has returned a guilty verdict.  Fed. R. Crim. P. 29(c).  In assessing the merits of such a motion, courts examine the evidence in the light most favorable to the jury's verdict, resolving all questions of credibility and drawing all reasonable inferences in favor of the verdict. <u>United States v. Arias-Izquierdo</u>, 449 F.3d 1168, 1175 (11th Cir. 2006); <u>United States v. Williams</u>, 390 F.3d 1319, 1323 (11th Cir. 2004).  Appellate courts afford any decision to enter a judgment of acquittal entered after a guilty verdict no deference on appeal. <u>Williams</u>, 390 F.3d at 1323; <u>United States v. Greer</u>, 850 F.2d 1447, 1450 (11th Cir. 1988).

In this case, the Defendants have moved for a judgment of acquittal "on each and every object within the conspiracy, as well as each and every element of the conspiracy." Defendants' Brief at 1. Specifically the Defendants contend that the Government failed to prove that they entered a conspiracy to launder money "knowingly" and "with specific intent." Defendant's Brief at 23. Additionally, they argue that the Government failed to show beyond a reasonable doubt that the Defendants "knowingly engaged or attempted to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000.00 and is derived from specified unlawful activity." Defendant's Brief at 21. Likewise, they argue that the Defendants engaged in neither "disguise and conceal" money laundering nor in "avoiding a report" money laundering. Defendants' Brief at 16, 18. Finally, the Defendants contend that Nhung did not engage in "promotional" money laundering. Defendant's Brief at 3. For two reasons, all of these arguments are ill-founded.

A.   The jury found the Defendants guilty of conspiracy, not substantive offenses.

The Defendants' suggestions that the Government failed to prove the essential elements of promotional, concealment, evasion, and § 1957 money laundering ignore that they were charged, not with those substantive offenses, but rather, with conspiracy to commit

3

them.  The essence of a conspiracy is "an agreement to commit an unlawful act."  United States v. Iannelli, 420 U.S. 770, 777 (1975).  Because agreement is the "essential element" of a conspiracy offense, conspiracy and the completed substantive offense that supplies the conspiracy's object are two separate crimes.  Iannelli, 420 U.S. at 778 n.10.

The reasons for this distinction are both numerous and well-established.  "[C]ollective criminal agreement . . . presents a greater potential threat to the public than individual delicts" because "[c]oncerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality."  Iannelli, 420 U.S. at 778.  Additionally, collaboration for a criminal purpose not only enables conspirators to attain "ends more complex" than individual actors could accomplish alone, but also increases the likelihood that crimes will be committed that expand the purpose for which the collaborative effort originally began.  Id.  Consequently, courts regard a conspiracy as "an evil in itself, independent[] of any other evil it seeks to accomplish."  Id. at 779.

In keeping with the policies underlying conspiracy law, 18 U.S.C. § 1956(h) criminalizes "conspir[ing] to commit any offense" set out in §§ 1956 or 1957.  Contrary to the Defendants'

suggestions, the elements of the offense of conspiracy to launder money in violation of § 1956(h) do not require proof of elements identical to the elements of the corresponding violations of §§ 1956 and 1957.   Cf. United States v. Quintero, 165 F.3d 831,837 (11th Cir. 1999)(concluding that because agreement is an essential element of a conspiracy, acquittal of such a conspiracy does not bar retrial on a substantive count); United States v. Henderson, No.01-40020-01-ROR, 2002WL 31730930, at *5 (D. Kan. Nov. 21, 2002) (noting that conviction for conspiracy does not require that the act that forms the object be completed).  Instead, the elements are quite simple, requiring only "(1) that there was an agreement between two or more persons to commit money laundering;[1] and (2)

---

[1]That is, in this case, an agreement to engage in conduct that, if attempted or completed, would satisfy the following elements:

Either that the Defendants (1) knowingly conducting or attempting a financial transaction; (2) with knowledge that the funds that were the subject of the transaction were derived from unlawful activity; (3) using funds that were in fact derived from a specified unlawful activity such as drug trafficking; and (4) for a prohibited purpose such as (a) promoting the underlying specified unlawful activity [§ 1956(a)(1)(A)(I)]; (b) concealing or disguising the nature, source, location, ownership, or control of the funds [§ 1956(a)(1)(B)(I)]; or © evading currency reporting requirements [§ 1956(a)(1)(B)(ii)]; see 11th Circuit Pattern Jury Instructions (Criminal), 2003, Instructions 70.1 and 70.2, pages 384-376;  or

That the Defendants (1) knowingly engaged in or attempted to engage in a monetary transaction as provided by statute (2) with funds valued at more than $10,000.00; (3) with knowledge that the funds came from an unlawful source; and (4) that the funds in fact came

that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." United States v. Threadgill, 172 F.3d 357, 366 (5th Cir. 1999); 11th Circuit Pattern Jury Instructions (Criminal), 2003, Instruction 70.5, pages 384-85; see United States v. Henry, 325 F.3d 93, 103 (2d Cir. 2003)(noting proof of a conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1)(B)(I) requires only proof of an agreement to  conduct a financial transaction using proceeds of a specified unlawful activity with knowledge that the proceeds come from an unlawful source for the purpose of concealing or disguising the nature, source, location, ownership, or control of the proceeds); United States v. Rivera, 295 F.3d 461 (5th Cir. 2002) (noting that § 1956(h) conviction required proof that defendant "knew of the conspiracy and voluntarily joined it intending to conduct a financial transaction" with specified unlawful activity proceeds); United States v. LaSpina, 299 F.3d 165, 182 (2d Cir. 2002)(defining the "essential elements" of a § 1956(h) conspiracy to violate § 1957  as requiring that the defendant "conspired with one or more persons to"  conduct or attempt to conduct a monetary transaction in more than $10,000.00 of criminally derived property, actual

from a specified unlawful activity in criminally derived funds valued at more than $10,000.00.  See 11th Circuit Pattern Jury Instructions (Criminal), 2003, Instruction 70.6, pages 386-87.

6

criminal derivation of that property from a specified unlawful activity, knowledge that the property was from unlawful activity).

In short, contrary to the Defendants' suggestions, the Government was not required to prove that they in fact attempted or completed conduct satisfying every single element of a violation of §§ 1956 and 1957, the objects of their conspiracy.  Instead, it was only required to prove that they agreed to do so and that they had each particular object as one of their purposes.  As discussed below, it did that and more.

B.   The evidence supported the jury's conclusions

The evidence presented at trial was more than sufficient to show that the Nhung and Jenny agreed with one another, Hoang Nguyen (Hoang), and others to commit money laundering offenses in violation of §§ 1957 and 1956(a)(1)(B)(i) and (B)(ii) and to show that Nhung agreed with Hoang and others to commit money laundering offenses in violation of § 1956(a)(1)(A)(i).  The evidence is likewise more than sufficient to support the jury's conclusion that both Nhung and Jenny joined in their agreement with one another, Hoang, and others with full knowledge of the agreement's purposes and intending to further those purposes.

That evidence showed that Nhung and Jenny were participants in a large scale conspiracy to launder proceeds from sales of Canadian hydroponic marijuana through money remitting businesses in

violation of 18 U.S.C. § 1956 and § 1957.  During its case-in-chief, the Government presented evidence as to the general manner in which that conspiracy operated.  That evidence showed that Canadian controllers such as Mai Le and Hong Tieu, both directly and through others, grew and then distributed hydroponically grown Canadian marijuana to people such as Hao Ngo (Ngo) and an individual known through Thai Ninh Le (Le) only as Hung from Gwinnett (Hung).  Once the marijuana dealers sold their drugs, people such as Hoang, Linh Tran, and Le either retrieved or coordinated deliveries of those funds from drug sellers to individuals associated with money remitting businesses, such as Nhung, Jenny, Hoa Nguyen, Ahn Chau, Lieu Ho, and Mong T. Cole. When the funds arrived at the money remitters, they were deposited into the remitters' business bank accounts with financial institutions such as Global Commerce Bank and RBC Centura Bank and then wire transferred to financial institutions located outside the United States in countries that included Vietnam, Switzerland, and Dubai, among others.[2]

---

[2]The Defendants' brief correctly acknowledges that each time drug money was handed to another individual, deposited into a bank account, or wire transferred from one place to another, a financial transaction occurred.  See 18 U.S.C. § 1956(c)(4) (defining financial transaction as including transactions in or affecting interstate commerce that involve "the movement of funds by wire or other means," involve "one or more monetary instruments" or involve "the use of an financial institution"); United States v. Dennis, 237 F.3d 1295, 1302 (11th Cir. 2001)(deeming transfer of funds from

1.   <u>Evidence of Acts and Events Prior to March 20, 2004</u>

The evidence relevant to Nhung and Jenny centered on transactions and relationships involving Hoang and his dealings with Hung and Ngo. The evidence showed that Le, who was a money courier, received a user amount of marijuana from Hung on at least one occasion when he was retrieving marijuana proceeds from Hung. Le retrieved drug proceeds from Hung on approximately ten occasions in amounts of approximately $100,000.00 each time.  On at least two occasions, directed by his Canadian controllers, Le delivered a total of $200,000.00 in cash to Hoang for transmission to Vietnam. That cash always reeked of marijuana.

Additionally, the Government's evidence outlined Hoang's relationship to Ngo, a North Carolina marijuana dealer also known as Louis who, beginning prior to July 2003 and ending with his arrest, sold approximately 100 pounds of Canadian marijuana per month for $2,800 and $2,850 per pound in the Charlotte area. (Trial testimony of Hao Ngo, Transcript 1, at 6, 25-27, attached hereto

---

one account to another a financial transaction involving financial institution); <u>United States v. Reed</u>, 77 F.3d 139, 142 (6th Cir. 1996) (finding that giving money to courier constituted a financial transaction); <u>United States v. Dimeck</u>, 24 F.3d 1239, 1246 (10th Cir. 1994) (concluding that transporting cash involves movement of funds by "other means").  The Defendants overlook that when they received the $414,870.00 from Ngo on March 22, 2004, they conducted a financial transaction that gave rise to an obligation for someone, either one of them or another person acting on behalf of Hoang Nhung Express, to file a Currency Transaction Report (CTR).

and referenced hereinafter as Ex.1). Ngo delivered marijuana proceeds directly to Hoang on four occasions in amounts totaling approximately $1.1 million. (Ex.1 at 30-39). According to Ngo, the money that he delivered to Hoang always smelled of marijuana. (Ex.1 at 37; Trial Testimony of Hao Ngo, Transcript 2, at 13, referenced hereinafter as Ex.2).

From this evidence, the jury could reasonably infer that money connected to Hoang was also money derived from the sale of marijuana. Likewise, the jury could also reasonably infer that money that Hoang delivered to others smelled of marijuana.

Contrary to the Defendant's contentions, the record shows that they engaged in financial transactions with drug proceeds prior to March 22, 2004. See Defendants' Brief at 4. The evidence showed that Nhung and Jenny, who jointly operated Hoang Nhung Express, were among the money remitters that Hoang used to launder drug money. Intercepted conversations showed that Hoang and Nhung spoke on December 14, 2003, and that they agreed to "work together." (Government's Trial Exhibit 42, attached hereto and referenced hereinafter as Ex.3, at 5). This evidence is part of the proof supporting a reasonble inference that Nhung entered an agreement to launder money with Hoang and others on that date.

Although the Government intercepted no other calls between Hoang and Nhung between December 14, 2003, and March 2, 2004, the

evidence supports a reasonable inference that they were regularly in contact with one another, sometimes multiple times in one day, during that period as shown in the following summary of toll records admitted at trial:

| DATE | TIME | NUMBER | INCOMING/ OUTGOING | GOV'T TRIAL EXHIBIT NO. |
|---|---|---|---|---|
| 01/16/2004 | 5:11 p.m. | 781-866-9742 | Incoming | 14[3] |
| 01/17/2004 | 5:17 p.m. | 781-866-9742 | Incoming | 14 |
| 01/17/2004 | 5:18 p.m. | 781-866-9742 | Incoming | 14 |
| 01/18/2004 | 11:49 p.m. | 781-866-9742 | Outgoing | 14 |
| 01/18/2004 | 11:55 p.m. | 781-866-9742 | Incoming | 14 |
| 01/19/2004 | 8:21 p.m. | 781-866-9742 | Outgoing | 14 |
| 01/19/2004 | 8:22 p.m. | 781-866-9742 | Outgoing | 14 |
| 01/19/2004 | 9:28 p.m. | 781-866-9742 | Outgoing | 14 |
| 01/19/2004 | 11:04 a.m. | 781-866-9742 | Incoming | 14 |
| 01/19/2004 | 11:05 a.m. | 781-866-9742 | Outgoing | 14 |
| 01/19/2004 | 12:01 p.m. | 781-866-9742 | Outgoing | 14 |
| 01/19/2004 | 12:08 p.m. | 781-866-9742 | Incoming | 14 |
| 01/22/2004 | 12:04 p.m. | 781-866-9742 | Outgoing | 14 |
| 01/25/2004 | 3:12 p.m. | 781-866-9742 | | 14 |
| 01/25/2004 | 5:16 p.m. | 781-866-9742 | | 14 |
| 01/25/2004 | 8:51 p.m. | 781-866-9742 | | 14 |
| 01/27/2004 | 3:35 p.m. | 781-866-9742 | | 14 |
| 01/28/2004 | 1:03 p.m. | 781-866-9742 | | 14 |
| 01/29/2004 | 3:09 p.m. | 781-866-9742 | | 14 |
| 01/29/2004 | 3:31 p.m. | 781-866-9742 | | 14 |

---

[3]Government's Trial Exhibit 14 is attached hereto and referenced hereinafter as Ex.4.

| 01/29/2004 | 3:32 p.m. | 781-866-9742 |          | 14     |
|------------|-----------|--------------|----------|--------|
| 01/29/2004 | 4:34 p.m. | 781-866-9742 |          | 14     |
| 01/31/2004 | 6:04 p.m. | 781-866-9742 |          | 14     |
| 03/12/2004 | 5:24 p.m. | 404-438-5632 | Outgoing | 273[4] |
| 03/12/2004 | 5:25 p.m. | 404-438-5632 | Outgoing | 273    |
| 03/12/2004 | 5:26 p.m. | 404-438-5632 | Outgoing | 273    |
| 03/17/2004 | 2:41 p.m. | 404-438-5632 | Incoming | 273    |
| 03/17/2004 | 3:09 p.m. | 404-438-5632 | Outgoing | 273    |

The record likewise supports a reasonable inference that Hoang was retrieving large amounts of cash reeking of marijuana from Le, Ngo, and possibly others during the same period, and that Nhung, who had marijuana in her bathroom at the time of her March 31, 2004, arrest, had an adequate base of experience with marijuana to recognize its smell.[5]  This evidence, especially when interpreted in light of the events of March 22, 2006, and viewed in conjunction

_____

[4]Government's Trial Exhibit 273 is attached hereto and referenced hereinafter as Ex.6.

[5]Contrary to the Defendants' intimations, the identity of the person to whom the marijuana seized from Nhung's master bathroom belonged is immaterial, for that evidence was offered only to show that Nhung was familiar with the substance's smell. Regardless of the identity of its owner, if the substance was smoked in Nhung's house as the pipe in the bathroom suggested, the jury could reasonably infer that marijuana was a smell that she knew.  This evidence, taken in conjunction with the evidence discussed throughout this Response, was sufficient to enable the jury to infer that Nhung knew the source of the funds that Hoang supplied and that as a result, when she and others involved in the conspiracy conducted financial transactions with those funds, she intended and agreed to conduct those transactions for the purpose of promoting drug dealing.

with evidence that Jenny made the following regular, cash deposits into the Hoang Nhung Express business account at Global Commerce Bank during the same period, further supports reasonable inferences not only that Hoang was  delivering or drug proceeds from Ngo, Le, and others to Nhung and Jenny for transmission to Vietnam but also that Nhung and Jenny were accepting those transactions at his behest:

| DATE | AMOUNT |
|------|--------|
| 01/07/2004 | $   100,000.00 |
| 01/09/2004 | $    90,030.00 |
| 01/13/2004 | $   180,030.00 |
| 01/20/2004 | $   227,300.00 |
| 01/28/2004 | $    70,120.00 |
| 01/29/2004 | $   162,000.00 |
| 01/30/2004 | $   212,000.00 |
| 02/02/2004 | $    44,000.00 |
| 02/04/2004 | $   150,000.00 |
| 02/06/2004 | $   134,000.00 |
| 02/09/2004 | $   161,000.00 |
| 02/17/2004 | $   200,000.00 |
| 02/20/2004 | $    42,000.00 |
| TOTAL | $1,772,480.00 |

(Government's Trial Exhibit 234, attached hereto and referenced hereinafter as Ex.7,  at 1-13).

When viewed together, particularly in light of the events leading up to the March 22, 2006, seizure, tolls and CTRs support

a reasonable inference that Nhung and Jenny wire transferred drug proceeds on behalf of Hoang on at least two other occasions.  On January 19, 2004, Hoang, using the number (781) 866-9742, called Nhung seven times throughout the day.  (Government's Trial Exhibit 281, attached hereto and referenced hereinafter as Ex.8, at 4).  Thereafter, on January 20, 2004, CTRs filed by Global Commerce bank as to the account belonging to Hoang Nguyen Express show that Jenny deposited $227,300.00 in cash into that account.  (Ex.7; Government's Trial Exhibit  236, attached hereto as Ex.9).

Similarly, between January 27 and January 28, 2004, Hoang, using the number (781) 866-9742, called Ngo at least eight times.  (Government's Trial Exhibit 281, attached hereto and referenced hereinafter as Ex.10, at 3).  Between January 28 and January 29, 2004, Hoang, again using the number (781) 866-9742, called Nhung at least five times.  (Ex.10 at 3).  CTRs filed by Global Commerce Bank  as a result of deposits into the Hoang Nhung Express account show that Jenny made cash deposits on January 29 and January 30, 2004, for $162,000.00 and $212,000.00, respectively.  (Ex.7, Ex.9).  This evidence is sufficient to show not only that Nhung and Jenny intended to engage in monetary transactions with Global Commerce

Bank in amounts of more than $10,000.00 but that they in fact did so.[6]

Transmittal records seized from the Hoang Nhung Express business location, when compared to e-mails seized from Nhung's residence, also supplied evidence of Nhung's and Jenny's intent. Although the evidence showed that Hoang Nhung Express's money remittals generally flowed from Atlanta to Vietnam, e-mails seized from Nhung's house contained lists of sender and receiver names that were sent to Nhung from Vietnam. (See e.g. Government's Trial Exhibits 205B, 205C, and 205D, attached hereto and referenced hereinafter as Ex.11). The evidence further showed that agents seized four binders from the Hoang Nhung Express premises at Hoang Nhung Jewelry, two of which were well-worn, and two of which were remarkably free of indications of use. Comparing the names contained in the e-mails to the names shown on the second, unworn

---

[6]The Defendants reliance on United States v. Johnson, 440 F.3d 1286 (11th Cir. 2006), for the proposition that the government "bears the burden of 'proving beyond a reasonably doubt that [the Defendants] '[sic] knowingly engaged or attempted to engage in a monetary transaction in criminally derived property that is of value greater than $10,000 and is derived from specified unlawful activity" is misplaced. Defendant's Brief at 21.  While the Government agrees that the Johnson set out the elements of the substantive offense of money laundering and discussed those elements in the body of its opinion, the case does not stand for the proposition that the government must prove an attempted or completed offense in violation of § 1957 to prove a money laundering conspiracy as the Defendants suggest. Johnson, 440 F.3d at 1289.

set of transmittal records shows significant overlap. (Government's
Trial Exhibits 216, 217; Ex.11).  Not once, however, do the names
Hoang Nguyen, Hau Ngo, Mai Le, or Hong Tieu appear in records from
the binders.

From this evidence and the evidence discussed above, the jury
could reasonably draw multiple inferences. First, the jurors could
infer that upon receiving drug proceeds directly or indirectly from
Hoang, Nhung and Jenny received false sender and receiver
information from someone in Vietnam. Second, they could infer that
Nhung and Jenny remitted money through Hoang Nhung Express's
business accounts to Vietnam. Third, they could infer that Nhong
and Jenny fabricated documentation found in the two immaculate
binders seized to show that the money transmitted came from a large
number of individuals when, in fact, the vast majority came from
only one source, Hoang.  In short, this evidence and the reasonable
inferences to be drawn from it show that Jenny and Nhung
effectuated the deposits shown in the CTRs and transmittals from n
the binders intending to conceal and disguise the nature, source,
location, ownership, and control of unlawfully derived proceeds.
This evidence is more than sufficient to qualify as substantial
evidence of intent to conceal.

Further analysis of these records showed that Hoang Nhung
Express deposited and transmitted approximately $2.1 million in

16

cash between January and March, 2004, to Vietnam, more than $1.7 million of which Jenny herself deposited into the Hoang Nhung Express business bank account.  (Government's Trial Exhibit 221, attached hereto and reference hereinafter as Ex.12; Ex.7).  Among the remittal requests that the records showed were the following transactions: a request to send $20,000.00; a  request to send $4,450.00; three requests to send $3,000 each; and approximately 2,000 requests to send amounts less than $3,000.00.  (Ex.12).

Despite its clear obligation to do so, Hoang Nhung Express never filed a single CTR at any point.  Furthermore, the evidence showed that Hoang Nhung Express failed to maintain required records for its transactions of $3,000.00 and more.

From this evidence and the evidence discussed above, a jury could reasonably infer that Nhung and Jenny, as the persons acting on behalf of Hoang Nhung Express, intended to evade currency reporting requirements.  Furthermore, the jury could conclude that the women manufactured documents with fictitious sender and receiver names to create the false impression that they received a multitude of transmittal requests falling under the record keeping requirements when, in fact, they received lump sums of money well over the record keeping thresholds for transmission to Vietnam from or on behalf of Hoang. See United States v. Miles, 290 F.3d 1341, 1346 (11th Cir. 2001)(deeming purchases in third party names

probative of intent to conceal); United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (finding purchase of cashier's check showing third party as remitter probative of intent to conceal). These inferences, in turn, support the conclusion that Nhung and Jenny not only agreed to evade currency reporting requirements and to conceal and disguise the nature, source, location, ownership, and control of unlawfully derived funds, but that they in fact did so.

In short, the evidence of events occurring prior to March 22, 2004, taken in conjunction with the reasonable inferences to be drawn therefrom, is more than sufficient to support the jury's finding that both Nhung and Jenny entered an agreement with Hoang and others to conduct financial transactions in proceeds of drug sales and that these financial transactions included receiving cash from Hoang Nguyen and couriers acting at his behest, depositing that cash into the Hoang Nhung Express business account at Global Commerce Bank, and wire transmitting the funds from Global Commerce Bank to financial institutions in Vietnam.  The evidence further supports the conclusion that Nhung engaged in the transactions for the purpose of promoting drug dealing, the underlying specified unlawful activity, and that both Jenny and Nhung engaged in financial transactions with the intent to conceal and disguise the nature, source, location, ownership, and control of those funds and

to avoid currency reporting requirements.  Finally, this evidence
was sufficient to support a finding that both Nhung and Jenny
engaged in monetary transactions with Global Commerce Bank by
depositing or agreeing to deposit proceeds traceable to an unlawful
activity into the Hoang Nhung Express account at that bank in
amounts of more than $10,000.00.[7]

     2.   Evidence of Acts and Events Occurring After March
             20, 2004

The events leading up to, including, and occurring after the
March 22, 2004, seizure not only gave meaning to earlier events but
also supplied an independent basis for finding criminal liability.
The evidence showed that on March 20, 2004, at 11:49 a.m., Hoang
called Nhung asked that Ngo be allowed to deliver money directly to
her.  (Government's Trial Exhibit 54a, attached hereto and
referenced hereinafter as Ex.13, at 3).  Nhung agreed to accept the
delivery at Hoang Nhung Cosmetics.  (Ex.13 at 3-5).

Nhung pointed out, "I did help out for Mr. An's side about one
hundred yesterday," evidence from which the jury could reasonably
infer Nhung's acknowledgment that she assisted Ahn Chau with moving

_____

[7]The Defendants make much of the fact that the Government did
not know that Nhung and Jenny were two different people prior to
the $414,870.00 seizure. This emphasis makes much of nothing, for
it overlooks that the jurors were entitled to interpret events
prior to March 22, 2004, in light of events occurring and evidence
gathered on and after that date.

$100,000.00 illegally derived funds. (Ex.13 at 6.) She also acknowledged keeping money in her residence, but she said that she was unwilling to take the money to her home "like the previous time." (Ex.13 at 7-8). The reference to "the previous time" supports the inference that Nhung received drug money from Hoang at her home on a previous occasion.

At approximately 12:28 p.m. that same day, when Hoang called Nhung a second time to find out what number she wanted Ngo to use, Nhung directed Hoang to supply Ngo with the cell number that Hoang used to call her, an instruction evidencing her agreement to join in Hoang's criminal purpose. (Government's Trial Exhibit 57, attached hereto and referenced hereinafter as Ex.14, at 2). Hoang then instructed Nhung to call when Ngo arrived, confirmed that Nhung had a money counting machine at the cosmetics store, warned Nhung that Ngo was "often short," and promised to send Terri to assist when Ngo arrived. (Ex. 14 at 2-4).

According to Ngo, at some point prior to the March 22, 2004, money delivery, a woman known to him only as "the lady," telephoned him, supplied him with Nhung's name and number, and directed him to call and arrange a delivery. (Ex.1 at 46-47). Ngo testified and toll records confirm that Ngo called Nhung between 12:47 and 12:50 p.m. on March 20, 2006, for that purpose. (Ex.1 at 47;

Government's Trial Exhibit 18, attached hereto and referenced hereinafter as Ex.15, at 4; Ex.6 at 11).

At 5:41 p.m. on March 20, 2004, Hoang and Nhung spoke a third time. (Government's Trial Exhibit 58, attached hereto and referenced hereinafter as Ex.16, at 1). During that conversation, Nhung confirmed Ngo's call and said that she expected Ngo to make the delivery the following day, further evidence supporting the conclusion that she was an active, knowing participant in the money laundering conspiracy. (Ex.16 at 2).

Hoang and Nhung again spoke a fourth time at 6:23 p.m. on that same day. (Government's Trial Exhibit 59, attached hereto and referenced hereinafter as Ex.17, at 1). During that conversation, Hoang told Nhung to say that the money that Ngo was to deliver was from Hoang older sister Phuong because, as he said, "I don't want anybody to know me." (Ex.17 at 2). These comments support a reasonable inference that Nhung knew of Hoang's intent to conceal and disguise the ownership and control of the funds. Hoang further acknowledged, "I have been working with you," a statement that supports the inference that the March 22, 2004, transaction was not the first time he had delivered drug money to Nhung for transmittal. (Ex.17 at 3). Similarly, when he said, "we want to be safe in doing things," his statement put Nhung on notice that she was engaging in risky behavior. (Ex.17 at 3). When Hoang

21

explained his methods for supervising a money transfer by saying, "I usually meet those guys [making the delivery] . . . from a distance, I let the boys meet, I observed from a distance only . . . . Because I am the program keeper . . . . It's not good . . . if they know me, they'll rush in, I'll be dead! . . . . Therefore only a few people know me," his statements supplied further evidence that Nhung knew his state of mind, knew that what she was and had been doing was illegal, knew of Hoang's status and role in the criminal organization, and knew that Hoang was trying to conceal his connection to the currency that she was and had been receiving. (Ex.17 at 3).

At 12:29 p.m. on March 21, 2004, Nhung spoke to an unidentified female, who was using Hoang Nguyen's telephone, to find out whether the delivery had arrived. (Government's Trial Exhibit 60, attached hereto and referenced hereinafter as Ex.18 at 1-2). Nhung indicated that she did not want to meet strangers at night, promised that she would call the people about the delivery shortly, and said that if the delivery was going to be late, she would instruct the couriers to come the following day. (Ex.18 at 2). Toll records enabled the jury to infer that Nhung in fact did those things, for they show that Ngo received an incoming telephone call from Nhung cell phone between 12:45 and 12:48 p.m. on that same day. This evidence bolsters the conclusion that Nhung

knowingly, willingly, and actively joined the conspiracy and acted
in furtherance of it. (Government's Exhibit 18 at 4; Government's
Trial Exhibit 273 at 11).

Toll records show that on March 22, 2004, at approximately
11:31 a.m., Ngo received an incoming call from Nhung, again an act
evidencing Nhung's intent to participate in the conspiratorial
objective. (Ex. 15 at 4; Ex.6 at 11). Thereafter, at 12:13 p.m.,
Hoang called Nhung, and Nhung reported that the delivery should
arrive between one and two o'clock. (Government's Trial Exhibit
62, attached hereto and referenced hereinafter as Ex.19, at 1-2).
Hoang advised Nhung that the couriers generally called to ask for
directions and again instructed Nhung to notify him when the
delivery arrived. (Ex.19 at 2-3).

Nhung's telephone toll records show that she received a call
from (416) 841-2686, a number that Ngo identified as belonging to
his Canadian controllers, at 2:10 p.m. (Ex.6 at 11). Thereafter,
Hoang and Nhung spoke a second time on that same day at 3:00 p.m.
(Government's Trial Exhibit 63, attached hereto and referenced
hereinafter as Ex.20). During that conversation, Nhung reported
that the delivery had not yet arrived but that she had spoken to
Phuong, Hoang's older sister. (Ex.20 at 1-2).[8]   According to

_____

    [8]Although the Defendants suggest that evidence of Nhung's
contact with Phuong was exculpatory, their argument fails to rise
above the level of a complaint that the jurors did not draw

Nhung, Phuong asked to be notified when the delivery arrived. (Ex.20 at 2).  Again, Hoang directed Nhung to call if any new information developed.  (Ex.20 at 3).

At approximately 4:21 p.m. that same day, as confirmed by toll records, Ngo telephoned Nhung and got directions to the cosmetics store.  (Ex. 1 at 49-51; Ex.6 at 12).  Shortly thereafter, at approximately 4:23 p.m., Nhung again evidenced her intent to participate in the conspiracy by calling Hoang a third time and notifying him that the delivery would arrive in forty minutes. (Government's Trial Exhibit 64, attached hereto and referenced hereinafter as Ex.21, at 1-2; Ex.6 at 12).

At approximately 4:55 p.m., agents observed Phuong The Truong (Truong), Ngo, and an Asian female arrive outside the cosmetics store in a white Mercedes.  Toll records confirm that at or near the time he arrived, Ngo again spoke to Nhung, who said that she was at the jewelry store and that he would have to wait for her. (Ex.1 at 49, 52-53; Ex.6 at 12).

When ten minutes passed without Nhung arriving, Ngo became nervous and telephoned Ahn, one of his Canadian controllers.  (Ex.1 at 53).  After speaking to Ahn, Ngo went inside the store where he

---

inferences that the Defendants would have liked from the evidence presented.

waited until Nhung arrived.  (Ex.1 at 54).  During the period when
he was waiting, Ngo saw Jenny inside the store.  (Ex.1 at 55-56).

After Nhung arrived, Ngo called Truong, who was still in the
Mercedes, and instructed him to bring the money.  (Ex.1 at 55-57).
Ngo acknowledged that the money came from marijuana sales.  Truong
complied and then returned to the Mercedes. (Ex.1 at 57; Ex.2 at
7).

At Nhung's direction, Ngo carried the box containing money
into the Cosmetic Store's back room and placed it on a chair.
(Ex.1 at 57; Ex.2 at 13).  There, Jenny opened the box, observed
its contents, and asked how much money it contained.  (Ex.1 at 58).
When  Ngo  responded  that  the  box  contained  approximately
$415,000.00, Jenny commented that it was only supposed to be
$200,000.00.  (Ex.1 at 58).  In response, Nhung interceded, saying
"It's ok." (Ex.1 at 58).

Consequently, with Ngo and Nhung watching, Jenny began to
count the currency from the box, an act that the jury could
reasonably infer evidenced her agreement to assist with the
conspiratorial objectives ultimately attributed to her.  (Ex.1 at
58-59; Ex.2 at 4-7); see United States v. Henry, 325 F.3d 93, 105
(2[d] Cir. 2003) (finding mere fact of participation in suspicious
transaction supplied evidence of conspiratorial agreement).  As
Jenny was counting the money, Terri Nguyen arrived.  (Ex.2 at 10).

25

Jenny counted the money two times to make sure the count was correct and placed the money in shopping bags, further evidence of her agreement with the other conspirators. (Ex.2 at 8-9).

Although the unusual nature of a transaction where a virtually unknown pair of individuals supply a fortune cookie box containing $414,870.00 in rubber banded cash was sufficient to put the participants on notice that the funds came from an unlawful source, additional evidence actually identified that source. See Henry, 325 F.3d at 104-105(finding receipt of $50,000.00 in brown paper sack supported knowledge element); United States v. Hurley, 63 F.3d 1, 12 (1st Cir. 1995) (concluding that even underlings who never dealt with drug dealers knew money was from drugs because of size and continuing nature of money deliveries and because of no other cash-generating business would require movement of such large quantities of money); United States v. Gallo, 927 F.2d 815, 822 (5th Cir. 1991) (relying in part on evidence of delivery of cash in box in parking lot to support knowledge element). Although Ngo testified that he did not remember whether he smelled marijuana while Jenny counted the money, the evidence is clear that Nhung, who was familiar with the smell of marijuana, and Jenny, who may have been, were present during the process. Because the jury could reasonably infer that the smell of marijuana was not only unremarkable to a marijuana dealer such as Ngo but also that the

odor might be more noticeable to Nhung and Jenny, who were not
constantly exposed to the substance to the same degree as Ngo, an
inference that the marijuana smell was easily detectible is
authorized. (Ex.2 at 13-14). Consequently, the evidence was
sufficient to support the conclusion that by accepting delivery of
the $414,870.00 for remittal to Vietnam, Nhung knowingly engaged in
a financial transaction to promote drug dealing and that both Jenny
and Nhung knew that the funds were from an unlawful source.[9]

Toll records also show that at 5:17 p.m., Nhung's cell phone
received a one minute call from (416) 841-2686, the number of Ngo's
Canadian controllers. (Ex.4). Shortly thereafter, at 5:22 p.m.,
Hoang called Nhung a fourth time. (Government's Trial Exhibit 65,
attached hereto and referenced hereinafter as Ex.22 at 1). During
the conversation, Nhung said that the money count was up to "$4 and
something." (Ex.22 at 1-2). When Hoang suggested that Nhung call
"older sister," Nhung indicated that both she and Ngo spoke to

---

[9]For the same reasons as set forth in footnote 6, supra, the
Defendants' reliance on Johnson, 440 F.3d at 1294 to argue that the
Government "completely failed to establish . . . that she [Nhung]
conducted or attempted to conduct a financial transaction"
intending to promote drug activity ignores that proof of an
agreement rather than an attempt or completed offense is required.
Defendants' Brief at 3. Furthermore, their reliance on United
States v. Carcione, 272 F.3d 1297, 1302 (11th Cir. 2001) is
similarly misplaced, for while the defendant in that case was
charged with both substantive money laundering offenses and
conspiracy, the case contains no suggestion that the  defendant
challenged the agreement element, and consequently, that Court did
not analyze the conspiracy charge separately.

Phuong just minutes before. (Ex.22 at 2-3). Hoang then advised Nhung, "We have to split it out," and Nhung agreed. (Government's Ex.22 at 3).

Nhung's agreement to split the $414,870.00 is significant. Money remitters are paid a percentage of the funds that they transmit. Consequently, no legitimate business reason exists to split the $414,870.00 with other remitters for transmission, for doing so would reduce profits. In light of such evidence, the jury could reasonably infer that Nhung agreed to split the $414,870.00 not only to conceal and disguise its nature, source, ownership, location, and control, but also, in light of her failure to file a CTR as to her receipt of those funds, with intent to evade currency reporting requirements.[10]

---

[10]The Defendants emphasis on Hoang Nhung Express's corporate form to suggest that they had no obligation to file CTRs or comply with reporting requirements misses several critical points. First, it ignores that corporations can act only through individuals and that the record shows that Nhung and Jenny were individuals through whom Hoang Nhung Express acted. Second, the evidence could supported the conclusion that Hoang Nhung Express, Inc. was Nhung's and Jenny's alter ego and that they wrongfully used its assets to commit criminal acts. Cf. United States v. Wyly, 193 F.3d 289, 302 (5th Cir. 1999)(finding corporate criminal liability instruction unnecessary where corporation shown to be alter ego of defendant). Third, regardless of whether the obligation to file a CTR belonged to them or to the corporation, the fact remains that neither they nor the corporation ever filed one, a fact that the Fifth Amendment does not bar the jury from using to draw inferences. In light of this evidence, the Defendants' arguments that the corporate form somehow insulates them from criminal liability is ill-founded.

Once the money count was complete, Ngo asked Nhung to notify him if she discovered a shortfall, and she agreed. (Ex.2 at 11). Shortly thereafter, Ngo left the cosmetics store and returned to the Mercedes, where Truong and the unidentified Asian female were waiting for him. (Ex.2 at 11). The trio left the shopping center.

At approximately the same time, Hoang called Nhung a fifth time, and she said that she was at the cosmetics store but getting ready to leave. (Government's Trial Exhibit 66, attached hereto and referenced hereinafter as Ex.23, at 1). She indicated that she could talk to him because she was wearing her headphone, a circumstance that Task Force Agent John Clayton observed as Nhung left the store and a circumstance that, along with Ngo's identification her voice and the seizure of the phone from underneath her pillow, supported the inference that Nhung was the woman speaking during all conversations intercepted from that number. (Ex.23 at 1-2).

During the conversation, Nhung said that she could "swallow $2 in advance" but intended to "leave the remaining for next week." (Ex.23 at 2). From these comments, the jury could reasonably infer that Nhung intended to deposit $200,000.00 into the Hoang Nhung Express account that week for transfer to Vietnam and hold the remaining $214,870.00 for deposit and transfer until the following week. (Ex.23 at 2). Again, given that Nhung had possession of the

full $414,870.00, no legitimate business reason existed to refrain from depositing and transmitting the entire amount at once. Consequently, the jury was free to infer not only that Nhung knew the funds were from an unlawful source but also that she had concealment as one of her objectives.

Hoang and Nhung then worried about possible money deliveries expected the following week, and Hoang advised Nhung, "If it's too much . . . if . . . can't handle . . . then I . . . . cut it down a little . . . ." (Ex.23 at 2). Hoang then reminded Nhung that she claimed to have "4 some thing the other day," but Nhung responded, "It's 4 something but help An's side now, and . . . can't leave too much in the house." (Ex.23 at 2-3). Nhung then explained, "I calculate that I have about 2 now at the other side. I'll transfer this one tomorrow," comments that show that her intent to deposit and wire transfer more than $10,000.00 in unlawfully derived proceeds at one time. (Ex.23 at 3). Nhung's comment, "I don't dare put it in too much at one time," offered further evidence not only of her consciousness of wrongdoing but also her intent to conceal and disguise, her intent to promote, and her intent to flout currency reporting requirements applicable to her and to the business that she was operating. (Ex.23 at 3).

When Nhung suggested that another person offered to take "a couple of tens" for transmission, Hoang responded negatively and

asked Nhung to "handle 2 or 2.5 something." (Ex.23 at 3).  From
this exchange,  the jury could reasonably infer that Nhung intended
to ask another money remitter to transfer a portion of the
$414,870.00, a suggestion that Hoang rejected, instead asking that
Nhung and Jenny  transmit $200,000.00 to $250,000.00.

     Hoang then said that if Nhung took "2.5" he would "take care
of the remaining" for Nhung. (Ex.23 at 3).  Hoang explained, "Next
week . . . he'll bring some more over," a statement that the jury
could have inferred meant that he expected to receive more drug
money for transmission the following week. (Ex.23 at 3).  When
Nhung acquiesced, explaining that Hoang's plan would not require
her to "hold too much here," the jury could reasonably conclude
that she understood these meanings and intended to assist  to Hoang
in effectuating his plan.   (Ex.23 at 3).

     Hoang and Nhung then discussed the possibility of a shortfall
of cash and at least one other instance where someone that they
knew lost "almost a M." (Ex.23 at 3-4).  During the conversation,
Nhung acknowledged, "One or two thousand is okay, but ten thousand
and some?  It's crazy."  (Ex.23 at 3-4).  Hoang responded, "It
doesn't matter how much they lose here, one or two or ten thousand
. . . all that money must be delivered at the other side. . . . All
numbers must be reported to the other side, because when received

31

here, that very amount will be notified and delivered to people at the other side." (Ex.23 at 4).

Nhung noted, "It's the same with every thing, when people do some thing in a long period of time, they have a tendency to be greedy." (Ex.23 at 4-5). She then explained, "It was similar situation with brother Hoang's brothers before. They were *good* people in beginning, and then they became dishonest later. They stole 100, then 200, and then one million." (Ex.23 at 5). From these statements, the jury could reasonably infer that she was well-aware of the manner in which money was laundered through money remitters and had been involved in such activities for some time. Hoang agreed, saying, "It's difficult to trust people in this business." (Ex.23 at 5).

Nhung then pointed out that a third person waited for Ngo and Truong in the car during the delivery, that the trio came in a white Mercedes, and that she believed the license plate was "933 something." (Ex.23 at 5-6). She told Hoang, "I pay attention to those things." (Ex.23 at 5-6). As agents observed Nhung drive through the parking lot in a manner consistent with countersurveillance, Nhung said, "I must watch to see if there is any one follow them when they're leaving . . ." and explained, "they might inform." (Ex.23 6-7). All of these comments and behaviors lend support to the conclusion that Nhung was aware of

her wrongdoing, intended to conceal her dealings from law enforcement authorities, and acted to further the conspiratorial objectives.

At approximately 5:56 p.m., agents watched as Jenny and Terri exited from the cosmetics store carrying several boxes and bags containing money, walked to Jenny's Mercedes, and placed the packages in the trunk, all acts evidencing Jenny's agreement and intent to join the conspiracy.  Jenny then got into the driver's seat, and Terri got into the passenger's seat.  The Mercedes pulled onto Buford Highway, and drove into Doraville, where Sergeant Sean Mahar of the Doraville Police Department activated his blue lights and stopped the car in the parking lot of the Asian Square shopping center. (Transcript of Trial Testimony of Sean Mahar, attached hereto and referenced hereinafter as Ex.24, at 8-9).

Ultimately, Jenny consented to a search of the Mercedes, and Sergeant Mahar found the $414,870.00.  (Ex.24 at 14).  When Sergeant Mahar asked Jenny how much money she had and whether the money belonged to her, she lied, saying that she had approximately $200,000.00 and that it was hers.  (Ex.24 at 14-16).  When Sergeant Mahar asked why Jenny had such a large amount of money with her, Jenny explained that she was transferring it from one store to another and that she was taking it to a store in the strip mall where her car was stopped.  (Ex.24 at 18, 24).  When asked whether

she had any documentation or receipts to explain why she had such
a large amount of money in her trunk, Jenny responded negatively.
(Ex.24 at 1 at 18).  From this evidence, the jury could reasonably
infer that Jenny was reaffirming her intent to participate in the
conspiratorial objective and that she was acting in furtherance of
those objectives with consciousness of her own guilt.[11]

Next, Officer Mahar, who was trained to use a narcotics
detection dog but had not yet received a certification for his dog,
asked another certified narcotics detection dog handler, Sergeant
Sanfelice, to examine the Mercedes.   (Ex.24 at 18-19).   Upon
examining the Mercedes, Sergeant Sanfelice's dog alerted to the
odor of illegal drugs emanating from the Mercedes' trunk. (Ex.24
at 19-22).   Sergeant Mahar then examined the currency with his
narcotics detection dog, and his dog, too, alerted to the odor of
illegal drugs emanating from the currency.  (Ex.24 1 at 23).

According to Sergeant Mahar, Jenny maintained during his
interview of her that she worked for a jewelry store and was
transferring the money in her trunk from that store to another
store.  (Ex.24 at 15-18).  She also said that she had "about
$200,000.00" in the trunk, confirmed that she did not have any

---

[11]The Defendants attempt to minimize the importance of these
lies and the lies that Jenny ultimately told to Lieutenant Jamie
Brown.  Their arguments fail to rise above the level of complaints
that the jury did not draw inferences in Jenny's favor, complaints
that are immaterial to the issue before the Court.

documents or receipts to corroborate the purported transfer, and said that she was taking the money to a store in the shopping center where she was stopped. (Ex.24 at 15-18, 24).

During an interview with Lieutenant Jamie Brown of the Doraville Police Department at about 7:30 p.m that same day, Jenny said that she owned or co-owned Hoang Nhung Jewelry and Hoang Nhung Express, located at the Asian Square shopping center. (Transcript of Trial Testimony of Jamie Brown, attached hereto and referenced hereinafter as Ex.25 at 7-8). Jenny claimed that she received the money from people in the community who wished to conduct money transfers through her money transmitting business over the course of approximately one and a half weeks, and she maintained that she could supply documentation of her receipt of that currency. (Ex.25 at 89). Jenny likewise said that she took the money from a safe inside the jewelry store a few days prior to the stop and placed it in her trunk. (Ex.25 at 8). According to Jenny, she planned to take the money to her house, where she would bundle and count it. (Ex.25 at 8). From this evidence, the jury could reasonably infer that Jenny intended not only to conceal and disguise the nature, source, ownership, and control of the $414,870.00 but also, based on her statement that she receive the funds from "people" rather than a single person, that she intended to evade currency reporting

35

requirements by claiming that the funds came from multiple sources rather than just one.

During the interview, Jenny, who acknowledged that she had $400,000.00, appeared frightened and nervous to Lieutenant Brown. (Ex.25 at 8-9). She likewise contended that she planned to deposit the funds into the Global Commerce Bank the following day and that from there the funds would be transferred to Vietnam where her family members would then disburse the money to the intended recipients. (Ex.25 at 9). From this evidence, the jury could reasonably conclude that Jenny intended to engage in monetary transactions in unlawfully derived funds in an amount of more than $10,000.00.

At 6:25 p.m. on March 22, 2004, Hoang called Nhung a sixth time because he had heard about the "problems." (Government's Trial Exhibit 68, attached hereto and referenced hereinafter as Ex.26, at 1-2). Nhung responded, "I'm going to die." (Ex.26 at 2). Nhung explained that as they spoke, Jenny had been stopped by the police and that the police were letting the dogs examine the money. Had she and Jenny been engaged in a legitimate transaction, this fact should not have caused Nhung such anxiety. (Ex.26 at 2).

At 10:27 p.m. on March 22, 2004, Hoang called Nhung a seventh time to ask whether Jenny had returned, and Nhung responded in the negative. (Government's Trial Exhibit 69, attached hereto and

referenced hereinafter as Ex.27, at 1).  Hoang asserted, "They
don't have the right to hold it from us . . . . We'll justify that
source (money) is ours . . . . it's up to us, to be smart, to know
how to answer those matters."  (Ex.27 at 2).  Nhung responded,
"That's alright .. . . I'm talking . . . to an attorney."  (Ex.27
at 2).

Several days later, on March 25, 2004, Nhung's daughter, Lisa
Nguyen, called Hoang from a pay phone, identified herself, and said
that her mother asked her to deliver the following message, "don't
call mommy until mommy solve mommy's problem, then mommy will
contact uncle [Hoang]. . . ."[12]  (Government's Trial Exhibit 75,
attached hereto and referenced hereinafter as Ex.28 at 1-2;
Government's Trial Exhibit 76, attached hereto and referenced
hereinafter as Ex.29, at 1-2).

Despite Jenny's contentions to Sergeant Mahar and Lieutentant
Brown, and despite Nhung's suggestions to the contrary, neither
Nhung, Jenny, Hoang Nhung Express, nor anyone else filed a claim to
the $414,870.00 (Government's Trial Exhibit 249, attached hereto
and referenced hereinafter as Ex.30).  Consequently, those funds
were forfeited to the United States, evidence from which the jury

---

[12]The comments by Nhung's daughter do not imply that Nhung was
severing all ties with Hoang, as the the Defendants suggest.
Instead, they point toward the conclusion that Nhung was simply
deferring further interaction with Hoang until matters relating to
the seized funds were resolved.

could reasonably conclude that the funds were traceable to drug
sales and that all persons associated with those funds intended to
distance themselves from the transaction that involved them.
(Government's Trial Exhibit 249, attached hereto as Ex.30).

       3.  <u>Summary of the jury's findings</u>

All of this evidence, taken collectively and along with the
reasonable inferences to be drawn therefrom, is more than
sufficient to support the jury's conclusions that Nhung and Jenny
agreed with Hoang and others to conduct financial transactions in
proceeds that in fact came from drug sales; that they in fact
engaged in financial transactions with those drug proceeds by
receiving them from Ngo, by depositing them into the Hoang Nhung
Express bank account at Global Commerce Bank, and by wire
transmitting them out of the this country to Vietnamese banks; and
that the purposes of their agreement included concealing and
disguising the nature, source, location, ownership, and control of
those funds and evading applicable currency reporting requirements.
It is further sufficient to support the finding that Nhung engaged
in the same transactions with the intent to promote drug dealing.
Finally, the evidence is sufficient to support the jury's finding
that both Nhung and Jenny engaged in monetary transactions with
Global Commerce Bank by depositing or agreeing to deposit proceeds

traceable to an unlawful activity into the Hoang Nhung Express account at that bank  in amounts of more than $10,000.00.

    C.   <u>The Defendants' motion should be denied</u>.

Because the Defendants' Motion erroneously suggests that the Government had to prove both the elements of conspiracy and the elements of each completed substantive money laundering offense that formed an object of the conspiracy, their Motion is without merit.  Furthermore, because the evidence and the reasonable inferences drawn therefrom, when viewed in the light most favorable to the jury's verdict, support the result that the jurors reached, granting the Defendants' motion is unwarranted.  Consequently, the Defendants' Motion for Judgment of Acquittal is properly denied.

<u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court deny the Defendants' Motion for Judgment of Acquittal pursuant to Rule 29(c).

Respectfully submitted,

DAVID E. NAHMIAS
UNITED STATES ATTORNEY

s/ Jenny R. Turner
JENNY R. TURNER
ASSISTANT U.S. ATTORNEY
Georgia Bar No.  719439

600 United States Courthouse
75 Spring Street, S.W.
Atlanta, Georgia  30303
(404)581-6000
(404)581-6181 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
UNITED STATES OF AMERICA        :
                                :        CRIMINAL ACTION
        v.                      :
                                :        NO. 1:04-CR-232-BBM
JENNY NGUYEN, and               :
NHUNG NGUYEN                    :
```

## CERTIFICATE OF COMPLIANCE AND SERVICE

This is to certify that I have prepared the foregoing Response to Defendants' Joint Motion for Judgment of Acquittal in compliance with Local Rule 5.1, NDGA., using Courier New 12 point type and have this day caused a copy of the same to be served on the following individuals either by causing a copy of the same to be deposited into the United States Mail with adequate postage affixed for delivery addressed as follows or via the Court's electronic filing system:

Wilmer Parker, III
One Securities Centre
3490 Piedmont Road, Suite 1050
Atlanta, GA 30305

David R. Rogers
314 Maxwell Road, Suite 100
Alpharetta, GA 30004

This 5th day of July, 2006.

s/ Jenny R. Turner
JENNY R. TURNER
ASSISTANT UNITED STATES ATTORNEY

41